UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

DR. ROBERT BRIAN STANG,

Plaintiff,

v. Case No. 1:26-cv-26226-LOUIS

UNIVERSITY OF MIAMI,

Defendant.
_____________________________________/

**PLAINTIFF'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Plaintiff, Dr. Robert Brian Stang, respectfully opposes the Motion of Defendant, University of Miami (the "University"), to Dismiss With Prejudice Plaintiff's Complaint for Failure to State a Claim [D.E. 13] (the "Motion"), and states as follows.

## I. INTRODUCTION

The University's Motion rests on a single premise: that the charge-filing clock for Dr. Stang's age-discrimination and retaliation claims began running on March 19, 2024, at an annual performance review, rather than on the dates the University actually removed him from his Echo Lab assignment, cut his pay, or replaced him with a younger worker, or even the date the University claims it provided unequivocal written notice of the purported decision. Every part of the Motion depends on that premise, which fails for threshold and substantive reasons alike.

First, untimeliness is an affirmative defense. The Supreme Court has held that the parallel Title VII charge-filing requirement is a mandatory claim-processing rule, not a jurisdictional limit, and in the Eleventh Circuit a limitations defense supports a Rule 12(b)(6) dismissal "only where it is 'apparent from the face of the complaint that the claim is time-barred.'" *Fort Bend Cnty. v. Davis*, 587 U.S. 541, 550-552 (2019) (the charge filing requirement is a claim-processing rule); *Wainberg v. Mellichamp*, 93 F.4th 1221, 1224 (11th Cir. 2024) (citation omitted). The Complaint does not establish a March 19 accrual date, and that date is disputed. It alleges only that, at a review "in or about March 2024," Dr. Stang was told his role "would end later that year." Compl. ¶ 26. The University supplies its March 19 date, and its theory of finality, only through a May 16, 2024, letter it attached to its own Motion. That letter is outside the pleadings, its significance is disputed, and it cannot be used to manufacture an accrual date on a motion to dismiss. To the extent it is considered, it supports the timeliness of Plaintiff's Charge.

Second, the governing accrual rule requires both a final, non-tentative decision and unequivocal notice of that decision. The Supreme Court has tied accrual to a decision that was "made and communicated," and the Eleventh Circuit has held that the clock does not run until the employee "is told that she is actually being terminated, not that she *might* be terminated *if* future contingencies occur." *Delaware State Coll. v. Ricks*, 449 U.S. 250, 258 (1980) ; *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 849 (11th Cir. 2000). Courts across the country, including the Third, and Seventh Circuits, for example, have held charges timely, or refused to hold them untimely, when measured from a later, actual termination date because the earlier communication

was tentative, unofficial, contingent, or lacking a definite date. A statement that a role "would end later that year," with no date, followed by a letter projecting one date and an actual removal on another, is not unequivocal notice of a final decision as a matter of law.

Third, measured from the discrete acts the Complaint actually alleges, the March 28, 2025, dual-filed Charge was well within both the 300-day ADEA period and the 365-day FCRA period. Indeed, even if the Court were to measure from the University's own May 16, 2024, letter, the Charge, filed 316 days later, is timely under the FCRA as a matter of arithmetic.

Fourth, the retaliation claims are timely. The consummated retaliatory act, the denial of recredentialing and bar from clinical work, was communicated on June 25, 2025, within 365 days of the June 10, 2026, Amended Charge. The Amended Charge also relates back to the original Charge, and retaliation growing out of a pending charge need not be separately exhausted at all.

Finally, even if the Court perceived some deficiency, dismissal with prejudice would be improper because the claims are not untimely on the face of the Complaint and amendment would not be futile. The Motion should be denied.

## II. BACKGROUND

The following allegations are drawn from the Complaint and its exhibits and are taken as true for purposes of the Motion.

Dr. Stang is a physician who has been employed by the University since 1986 and who, since 1989, performed a weekly Thursday assignment at the University of Miami Hospital Echo Lab reading and analyzing ultrasounds. Compl. ¶¶ 21, 23. He was recredentialed annually for nearly forty years, was never disciplined, and was never advised of any performance deficiency. *Id.* ¶¶ 24-25.

At his annual performance review in or about March 2024, Dr. Yiannis Chatzizisis, Chief of the Cardiovascular Division, told Dr. Stang that his Echo Lab role "would end later that year." *Id.* ¶ 26. Dr. Chatzizisis identified no performance reason and, when asked, stated: "Out with the old and in with the new." *Id.* ¶¶ 27-28. Another older physician was similarly told the Department needed to make room for "new energetic people." *Id.* ¶ 29. There was no indication as to how the decision had been made, whether it was final, or whether all appropriate approval channels had been utilized to effect a final decision. In early June 2024, Dr. Stang complained to Dr. Joan St. Onge, Senior Associate Dean for Faculty Affairs, that any effort at removal was age

discrimination, and he also contacted Human Resources. *Id.* ¶¶ 30, 34. Dr. St. Onge responded that she would look into the allegations and speak with those involved, Dr. Stang awaited the results of that investigation, and the University thereafter offered a shifting, non-age-based explanation. *Id.* ¶¶ 30-36.

On September 21, 2024, a date different from that which the University contends was the end date Dr. Stang was told, the University removed Dr. Stang from the Thursday Echo Lab assignment, and on October 1, 2024, his full compensation ceased. *Id.* ¶¶ 43-44. He was replaced by a materially younger physician in or around July or August 2024. *Id.* ¶ 47. In his Charge, Dr. Stang stated: "The adverse action actually took place on September 21, 2024, when I was terminated from the Thursday assignment, and October 1, 2024, the date after which I ceased to receive my full pay." D.E. 1-1. The Charge identified the earliest date of discrimination as March 2024 and the latest as October 1, 2024, and checked the "continuing action" box. *Id.*

After his removal, Dr. Stang sought to continue clinical work through recredentialing. Compl. ¶ 50. Dr. Chatzizisis refused to complete a required form and instructed another physician to dissuade Dr. Stang from pursuing recredentialing. *Id.* ¶¶ 53-54. Dr. Stang persisted, and the form was redirected to the VA Chief, who completed it satisfactorily. *Id.* ¶ 62. Based on decades of seamless recredentialing, Dr. Stang would ordinarily have received approval by May 2025. *Id.* ¶ 63. When he had heard nothing by June 2025, he inquired, and on June 25, 2025, he received the response: "As per your department decision, you don't need to be credentialed since you are not clinically active." *Id.* ¶¶ 64-65. Only then was he denied recredentialing and barred from clinical work at the Hospital. *Id.* ¶ 68.

Dr. Stang dual-filed his Charge with the EEOC and the Florida Commission on Human Relations ("FCHR") on March 28, 2025. *Id.* ¶ 16. He amended the Charge by request to the EEOC on December 4, 2025, and filed a formal Amended Charge on June 10, 2026, and the EEOC issued a right-to-sue notice on June 15, 2026. *Id.* ¶¶ 17-18. He filed this action on September 10, 2026.

The University's Motion attaches, as Exhibit A, a letter dated May 16, 2024, from Dr. Chatzizisis that purports to "summarize our discussion held on March 19, 2024" and states that "as of August 31, 2024, you would conclude the clinical activities at UM and your clinical UM salary would be reduced to $5,000 annually starting on October 1, 2024." Mot. at 2-3 [D.E. 13-1]. The Complaint neither attaches nor refers to that letter.

## III. LEGAL STANDARD

A statute-of-limitations bar is "an affirmative defense, and ... plaintiff[s] [are] not required to negate an affirmative defense in [their] complaint." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004) (citation omitted). Accordingly, "a Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate only if it is 'apparent from the face of the complaint' that the claim is time-barred." *Id.*

Florida applies the same rule to the FCRA claims. The limitations defense "may be raised in a motion to dismiss only if its violation is conclusively established on the face of the complaint or its exhibits," and the court's review "is limited to the examination of the complaint and its attachments." *Mooshie v. Fla. State Lodge Fraternal Ord. of Police*, 397 So. 3d 1202, 1204 (Fla. 1st DCA 2024). A trial court "may not dismiss a complaint based on an affirmative defense that requires consideration of matters outside the four corners of the complaint." *Grek on behalf of Grek v. CL Golden,* LLC, No. 1D2025-1955, 2026 WL 2106762 at *1 (Fla. 1st DCA July 22, 2026).

On a Rule 12(b)(6) motion, "a court generally may not consider matters outside of the pleadings without treating the motion as a motion for summary judgment[.]" *Johnson v. City of Atlanta*, 107 F.4th 1292, 1298 (11th Cir. 2024). The incorporation-by-reference exception permits consideration of an unattached document only if it is "(1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged." *Id.* at 1300. When the parties and the court rely on materials outside the pleadings, the motion must be treated as one for summary judgment. *Bost v. Fed. Express Corp.*, 372 F.3d 1233, 1237 (11th Cir. 2004).

## IV. ARGUMENT

### A. THE UNIVERSITY CANNOT ESTABLISH ITS TIMELINESS DEFENSE ON THE FACE OF THE COMPLAINT.[1]

#### *1. Plaintiff Does Not Plead a March 19, 2024 Accrual Date or a Final Decision.*

The University's entire Motion is an affirmative defense, and Dr. Stang had no obligation to plead around it. *La Grasta*, 358 F.3d at 845–846. The University asserts that the limitations

[1] While the caselaw herein generally addresses ADEA claims, Plaintiff's arguments and requested relief apply with equal force to his FCRA claims, as "[c]ourts employ the same analysis when

clock began on "March 19, 2024," the date of the performance review. Mot. at 8. But the Complaint pleads only that the review occurred "in or about March 2024" and that Dr. Chatzizisis told Dr. Stang his role "would end later that year." Compl. ¶ 26. Nothing in the Complaint fixes a March 19 date, specifies an end date, or characterizes the March statement as a final, communicated decision. To the contrary, the pleadings identify as adverse actions the September 21, 2024, removal and the October 1, 2024, pay cessation. Compl. ¶¶ 43-44.

The University's motion does not argue that the Complaint itself establishes untimeliness; it argues that the Charge, the Amended Charge, and the Complaint are "directly at odds with controlling law" because they measure from the actual removal rather than the March review. Mot. at 6. But that is a merits dispute about when a final decision was made and unequivocally communicated, and it is precisely the kind of factual question that cannot be resolved on the pleadings. In *La Grasta*, the Eleventh Circuit reversed a limitations dismissal in another context because "there are various unanswered questions" bearing on accrual, and "it would be improper at this stage to assume that they would be answered adversely" to the plaintiffs. *La Grasta,* 358 F.3d at 847. The court explained that, "depending on what discovery reveals, the result at the summary judgment stage may or may not be the same. But on this record, it is not apparent on the face of the complaint that the ... claim is time-barred." *Id.* at 848. The Eleventh Circuit has applied the same principle in the securities fraud context, recognizing that whether plaintiffs were on notice of their claims "often cannot be resolved on a Rule 12(b)(6) motion and requires discovery." *Tello v. Dean Witter Reynolds, Inc.,* 410 F.3d 1275, 1293 (11th Cir. 2005) *abrogated on other grounds by Merck & Co. v. Reynolds*, 559 U.S. 633 (2010).

Florida law yields the same result for the FCRA claims. In *Mooshie*, the First District reversed a dismissal with prejudice of an employment-discrimination suit because the date "essential to Appellee's motion to dismiss ... did not appear on the face of the complaint," and "[b]y straying from the complaint and relying on the documents attached to Appellee's motion to dismiss, the trial court circumvented the four corners rule." 397 So. 3d at 1205. That is this case. The accrual date the University needs does not appear on the face of the Complaint, and the University can supply it only from an exhibit to its own Motion.

---

evaluating age discrimination claims under the ADEA and FCRA." *Cardelle v. Miami Beach Fraternal Order of Police*, 593 Fed. App'x. 898, 901 n.6 (11th Cir. 2014).

Courts addressing termination-notice accrual at the pleading stage have repeatedly refused to dismiss on this basis. The Seventh Circuit in *Flannery* reversed a Rule 12(b)(6) dismissal of ADEA claims, holding that "the date on which an unlawful employment practice occurs—in this case, when a termination decision is final and when unequivocal notice is given—is a question of fact," and that the competing notice dates "certainly cannot be decided at this early stage of the litigation." *Flannery v. Recording Indus. Ass'n of Am.,* 354 F.3d 632, 640-641 (7th Cir. 2004). The Eastern District of Virginia denied a motion to dismiss where the employer's termination notices were contingent and indefinite, holding that they "fail, individually and collectively, to constitute final and unequivocal notice of termination sufficient to trigger running the limitations period." *Connolly v. Mills Corp.*, 430 F. Supp. 2d 553, 559 (E.D. Va. 2006). And the District of Colorado denied a Rule 12(b)(6) motion in 2026 where a university letter announcing an employee's termination was conditioned on a dean's concurrence, holding that the letter "did not give… notice of the University's final decision to terminate… and did not start the accrual period." *Brauweiler v. Univ. of Colorado*, No. 25-CV-03501-PAB-NRN, 2026 WL 2823379 at *5 (D. Colo. Sept. 21, 2026).

Where the complaint does not fix the date of the operative act, the limitations defense cannot be resolved on a motion to dismiss. That is the situation here, where the Complaint alleges only a review "in or about March 2024" without any indication as to either the actual finality of any decision communicated and/or the parties' understanding regarding finality; where subsequent actions and statements alleged show that the decision may not have been final in March; the Complaint further alleges additional adverse action in the form of the hire of a substantially younger employee to replace Plaintiff; and even the unequivocal notice Defendant seeks to include here sent in May, would render the Charge timely at least as to the FCRA claim. The Motion should be denied for these reasons alone.

***2. The May 16, 2024 Letter Cannot Be Considered on This Motion.***

The University fills the gap in its argument with a May 16, 2024, letter attached to the Motion as Exhibit A, invoking the incorporation-by-reference doctrine. Mot. at 3 & n.2. The doctrine does not apply.

First, the letter is not central to Dr. Stang's claims. Dr. Stang's claims are built on the September 21, 2024, removal, the October 1, 2024, pay cessation, his replacement by a younger

physician in July or August 2024, and the June 2025 recredentialing denial. Compl. ¶¶ 43-47, 65-68. The letter is relevant, if at all, only to the University's affirmative defense. Courts in this Circuit have declined to consider a defendant-proffered letter that "is not central to plaintiffs' case, although it may have relevance to an affirmative defense." *Absolute Activist Value Master Fund Ltd. v. Devine*, 233 F. Supp. 3d 1297, 1319 (M.D. Fla. 2017) (refusing to take judicial notice of a letter in order to consider it on consideration of a motion to dismiss because it was not central to the plaintiff's case, and instead related only to the affirmative defense). As another court in this Circuit explained in 2026, "[t]he fact that the Agreement is relevant to [the defendant's] defense does not permit consideration," because a document that is central to an affirmative defense may nonetheless fail to be central to the plaintiff's claim. *Alexis v. Motel 6 Operating L.P.,* No. 4:25CV248-MW/MAF, 2026 WL 1196108, at *2 (N.D. Fla. Mar. 10, 2026). The Complaint can be proven without any reference to the May 16 letter.

Second, even when incorporation by reference applies, a court should not use an extrinsic document to resolve a factual dispute against the plaintiff's well-pleaded allegations. That is exactly what the University asks the Court to do. It offers the letter not to show what the letter says, but to establish as a fact that a "decision had been made" on March 19 that was a final decision which had gotten all necessary approvals, and was unequivocally communicated as such that day. Mot. at 2. Dr. Stang disputes that characterization.

If the Court were inclined to consider the letter and the competing characterizations of what was communicated in March 2024, the proper course would be to treat the Motion as one for summary judgment and permit the parties to develop the record, not to dismiss with prejudice. *Bost*, 372 F.3d at 1237.

***3. Even on Its Own Terms, the Letter Does Not Establish Untimeliness.***

Even if the Court considered the letter, it would not establish the University's defense, and actually supports the timeliness of Plaintiff's claim, for three reasons.

First, the letter is inconsistent with the University's own theory and with the pleaded facts. It projects that Dr. Stang would "conclude the clinical activities" as of August 31, 2024. Mot. at 3. The Complaint alleges that he was not actually removed until September 21, 2024. Compl. ¶ 43. The letter's August 31 date, and the pleaded September 21 removal are different dates. The gap between the projected end date and the actual removal supports a reasonable inference that the

operative decision was not fixed in March. In *Westinghouse*, abrogated on other grounds, the Third Circuit distinguished *Ricks* precisely because, unlike the professor there who had "precise specificity as to the date of termination," the employees had not received "any notice—oral or written—of the actual date" of the adverse action. *EEOC v. Westinghouse Elec. Corp.*, 725 F.2d 211, 220 (3d Cir. 1983).

Second, the letter shows that what the University communicated in March, according to the University itself, was oral. The University's own exhibit describes itself as a written summary prepared nearly two months later. Mot. at 2-3. The content and finality of an oral conversation at a performance review is a quintessential factual question. For example, the Third Circuit has reversed summary judgment for the employer because the evidence about what was said in communications relating to termination did "not lead unambiguously to one conclusion." *Bailey v. United Airlines*, 279 F.3d 194, 201 (3d Cir. 2002). Similarly, the Third Circuit found a genuine factual dispute where the employer's earlier communications were "orally communicated and in that regard, vague in its particulars" and "contingent upon certain events." *Westinghouse Elec.,* 725 F.2d at 220 n. 5. If those disputes precluded summary judgment, they necessarily preclude dismissal on the pleadings.

Third, even accepting the letter at face value as the first written notice, the FCRA claim is timely as a matter of arithmetic. The Charge was dual-filed on March 28, 2025, which is 316 days after May 16, 2024. That is within the FCRA's 365-day period. *See Wen Liu v. Univ. of Miami Sch. of Med.*, 693 F. App'x 793, 796 (11th Cir. 2017). Thus, under any reading of the letter as the operative written notice, the University's challenge to the FCRA discrimination claim fails.

### B. THE CHARGE-FILING PERIOD BEGINS ONLY WHEN THE EMPLOYER MAKES A FINAL DECISION AND GIVES UNEQUIVOCAL NOTICE OF IT.

#### *1. The Supreme Court Requires a Final Decision That Is Made and Communicated.*

In a deferral state such as Florida, a charge must be filed within 300 days "after the alleged unlawful employment practice occurred." *Id.* Under the FCRA, a charge must be filed within 365 days of the alleged violation. *Id.* The question is when the unlawful practice "occurred."

In *Ricks*, the Supreme Court held that "the only alleged discrimination occurred–and the filing limitations periods therefore commenced–at the time the tenure decision was made and communicated to Ricks." 449 U.S. at 258. The decision there was unmistakably final and a final

date was communicated. The tenure committee had twice recommended against tenure, the Faculty Senate concurred, and the Board of Trustees "formally had voted to deny Ricks tenure," so that the College "had established its official position–and made that position apparent to Ricks." *Id.* at 262. Ricks was offered a one-year "terminal" contract, "with explicit notice that his employment would end upon its expiration" a date-certain. *Id.* at 258.

The Supreme Court applied the same rule where each employee "was notified by letter that his appointment would terminate at a specified date," holding that "respondents were notified, when they received their letters, that a final decision had been made to terminate their appointments." *Chardon v. Fernandez*, 454 U.S. 6, 6–8 (1981).

The common thread is finality and communication. *Ricks* and *Chardon* involved formal, institutional decisions, communicated in writing, specifying a definite date on which employment would end. Neither case holds that a supervisor's undated remark that a role "would end later that year" starts the clock. And *Ricks* itself recognized that the inquiry is whether the employer had "established its official position" and made it "apparent" to the employee. 449 U.S. at 262.

***2. The Eleventh Circuit Requires Unequivocal Notice of an Actual, Not Contingent, Decision.***

The Eleventh Circuit has translated *Ricks* and *Chardon* into a two-part requirement. The filing period runs from "[a] final decision to terminate the employee," and "[a] 'final decision' that remains uncommunicated to the terminated employee has no impact on the statutory filing deadline." *Wright v. AmSouth Bancorporation*, 320 F.3d 1198, 1201 (11th Cir. 2003) (citation omitted) The clock starts only when the employee "receives *unequivocal notice* of the adverse employment decision." *Grayson v. K Mart Corp.,* 79 F.3d 1086, 1100 n. 19 (11th Cir. 1996).

The Eleventh Circuit has also made clear what does not qualify. Where an employee "may have had reason ... to suspect that she *might* be terminated," that is "not enough to start the charge filing period running," because "the 180-day charge filing period does not run until the plaintiff is told that she is actually being terminated, not that she *might* be terminated *if* future contingencies occur." *Stewart,* 232 F.3d at 849. The court explained why: "to require a plaintiff to file a discriminatory termination charge with the EEOC prior to the receipt of notice of termination would be to require a filing prior to the occurrence of the discriminatory conduct, thereby charging the EEOC with responsibility for the arguably advisory task of investigating a hypothetical case of discrimination." *Id.*

In another instance, where the supervisor suggested that the plaintiff begin looking for other work, and the plaintiff later testified that "they had made up their mind that they were going to fire me[,]" the Eleventh Circuit held that this evidence showed only the plaintiff's "subjective belief that his termination was inevitable," and "provides no evidence of either a firm decision to fire" the employee "or a communication of such a decision." *Wright*, 320 F.3d at 1203. As the court put it, "[w]hen an employee is left simply to infer and deduce his employment status from the surrounding events, no *unequivocal* communication of an adverse employment decision has occurred." *Id.* The court vacated summary judgment, finding an issue of fact as to whether the employee filed his charge of discrimination within 180 days of receiving notice of his termination. *Id.* Significantly, *Wright*, like *Stewart*, was decided on a full summary-judgment record. If the timing question in those cases could not be resolved against the employee on evidence, it cannot be resolved against Dr. Stang on the pleadings.

Moreover, here, Dr. Stang did not know if intervening events, such as the investigation of his complaint, would affect any decision being made with respect to his employment. This type of uncertainty, too, has been held to render a decision insufficiently final to trigger the running of the clock. *See Connolly*, 430 F. Supp. 2d at 560 (termination notice insufficiently definite where "intervening events might well lead to a reversal of the termination decision."); *Westinghouse Elec.*, 725 F.2d at 219–220 (limitations period ran from the actual layoff, not earlier counseling sessions, in part because the employees had received no notice "of the actual date" of the plant closing and "might have been under the impression that the ... plant would not be closed for months or even years.").

Also significant, here the purported end date (even as set forth in the May "notice" attached to the University's Motion) was not the actual end date of employment. As such, even if the May "notice" can be considered an unequivocal statement regarding an end date that was communicated as of that date, given that Dr. Stang's employment did not actually end on that date, the pleadings permit a reasonable inference that the actual termination date and decision was communicated at a different, later date.

***3. The Pleaded Facts Plausibly Show That No Final, Unequivocal Decision Was Communicated in March 2024.***

Applying these principles, the Complaint plausibly alleges that the operative adverse decision was not finalized and unequivocally communicated until September 2024 – or at least until July or August when a younger replacement was hired.

The March 2024 statement was undated and indefinite. "Later that year" could mean any time in the following nine months, and it gave Dr. Stang no fixed date from which to act. That is materially different from the "1-year 'terminal' contract, with explicit notice that his employment would end upon its expiration" in *Ricks*, or the letters "that his appointment would terminate at a specified date" in *Chardon*. Even the May letter does not set the actual date of termination.

The University's post-review conduct was inconsistent with a settled decision. When Dr. Stang complained of age discrimination in June 2024, the Senior Associate Dean responded that she would look into the allegations and speak with those involved. Compl. ¶¶ 30-36. A reasonable factfinder could conclude that the University had not finalized its decision while it was reviewing whether the decision itself was discriminatory. This is not a case, like *Ricks*, in which a grievance was filed as "a *remedy* for a prior decision" that was already final; the question is whether a final decision existed at all before September 2024.

Plaintiff is aware that *Ricks* holds that initiation of a grievance procedure, on its own, does not negate the finality of a prior final decision. However, there are distinguishing factors in this case. First, in in *Ricks*, a series of steps had been taken making it clear that the decision made was the final and official position of the employer. 449 U.S. at 262 (tenure committee had twice recommended against tenure, the Faculty Senate concurred, and the Board of Trustees formally had voted to deny tenure). Second, Dr. Stang's June 2024 complaint was not to initiate a grievance procedure designed as an explicit remedy for termination, but rather to ask the University to investigate whether any discrimination had taken place. The results of that investigation would necessarily inform his understanding of his claim. Third, at the conclusion of the investigation, Dr. Stang was given a new, different reason for the determination, which suggests that the decision was still being formed during the "investigation" process.

Moreover, the dates are inconsistent. The University's own letter projected one end date, and the University removed Dr. Stang on another. Mot. at 3; Compl. ¶ 43. When the employer's own communications and conduct diverge, the employee is "left simply to infer and deduce his

employment status from the surrounding events," which is the circumstance in which "no *unequivocal* communication of an adverse employment decision has occurred." *Wright*, 320 F.3d at 1203.

Finally, Dr. Stang's own understanding does not change the analysis. The University emphasizes that Dr. Stang's Charge and Complaint acknowledge that he was told in March that his assignment would end later that year. Mot. at 2. The Complaint does refer to the "planned removal," his "pending termination" from the Echo Lab position, and his having "been informed that UM would remove him." Compl. ¶¶ 27-28, 38, 91. Those allegations describe what Dr. Stang understood he had been told about a future event, not a final decision with a fixed effective date. There is no indication as to the channels, if any through which such a termination needed to be approved and whether it had gone through same. The Complaint also alleges that the University's stated reason later shifted to a TEE qualification never previously mentioned, and that, had he been told of it, Dr. Stang could have obtained certification "by or around the time his replacement started." Compl. ¶¶ 35-38. That allegation underscores that the outcome remained open to change in the months after March. But the Eleventh Circuit has held that an employee's "subjective belief that his termination was inevitable ... provides no evidence of either a firm decision to fire [him] or a communication of such a decision." *Wright*, 320 F.3d at 1203. The inquiry focuses on what the employer decided and communicated, not on what the employee feared. Here, it is not apparent on the face of the Complaint that what was communicated was a final decision, and not the sort of future, contingent statement held to be insufficient in *Stewart.*

### C. MEASURED FROM THE DISCRETE ACTS THE COMPLAINT ALLEGES, THE AGE-DISCRIMINATION CHARGE WAS TIMELY.

A discrete discriminatory act "'occurred' on the day that it 'happened,'" and "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110, 114 (2002). The Eleventh Circuit applies that rule to hold that "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1291 (11th Cir. 2002) (citation omitted).

The Complaint challenges the September 21, 2024, removal from the Echo Lab and the October 1, 2024, cessation of full pay. Compl. ¶¶ 43-44. Dr. Stang dual-filed his Charge on March 28, 2025, which is 188 days after the September 21 removal and 178 days after the October 1 pay

cessation, well within the required 300 and 365-day timeframes. If the purported March notice was not final and unequivocal, the Charge is timely as to these events.

The age-based replacement of Dr. Stang is a separate, timely discrete act. The Complaint alleges that in or around July or August 2024 the University replaced him with a materially younger physician. Compl. ¶ 47. The discriminatory replacement is a discrete alleged act. It should be treated as akin to a refusal to hire that carries its own charging clock. *Cf. Morgan*, 536 U.S. at 114; *Riccard,* 307 F.3d at 1291. Measured even from July 1, 2024, the earliest possible date, the March 28, 2025, Charge was filed 270 days later, within both the 300 and 365-day periods.

Dr. Stang also charged a continuing course of conduct, checking the "continuing action" box and alleging a departmental practice of replacing older physicians with younger ones. Charge at 2; Compl. ¶¶ 29, 47. Even if the March 2024 statement were itself untimely as an independent act, Dr. Stang may still use "prior acts as background evidence in support of a timely claim." *Morgan,* 536 U.S. at 113.

The University's contrary calculation works only from its disputed March 19, 2024, date. Stripped of that premise, which rests on an extrinsic letter the Court cannot consider for its asserted significance, the University's own framework confirms timeliness.

### D. THE UNIVERSITY'S AUTHORITIES ARE DISTINGUISHABLE.

*Ricks* and *Chardon*, the primary cases on which the University relies, are distinguishable. As shown above, both cases involved formal, institutional decisions, communicated in writing, with a definite date on which employment would end. Neither involved an undated oral statement at a performance review followed by an investigation of a discrimination complaint with a purported legitimate non-discriminatory reason provided to the employee at the conclusion of the investigation, and an actual removal on a date different from the one later projected.

*Plagianes v. Fulton Cnty. Sch. Dist.,* No. 25-12282, 2026 WL 1195531 (11th Cir. May 1, 2026), an unreported decision without precedential effect,[2] is also distinguishable. Unlike the circumstances in *Plagianes,* here any purported notice to Dr. Stang was followed by the Senior

---

[2] 11th Cir. Civ. App. R. 36-2 ("Unpublished opinions are not considered binding precedent"); *Wilkerson v. Hicks*, 750 F. Supp. 3d 1313, 1325 n. 4 (M.D. Ala. 2024), *appeal dismissed*, No. 24-13141-AA, 2025 WL 915524 (11th Cir. Jan. 10, 2025) (unreported Eleventh Circuit decisions are not binding on district court).

Associate Dean's undertaking to investigate a discrimination complaint, and the actual termination date was inconsistent with the date the University itself claims it told Dr. Stang his job would end. In addition, Dr. Stang did not resign his employment near the date of the notice of termination, as the plaintiff in *Plagianes* did, nor was he told specifically that he would not be allowed to return to work after the date of the notice. Instead, he continued to work as usual through the date of the eventual termination of the position.

The remainder of the University's cases, such as *Wen Liu, Drisin,* and Thomas, while distinguishable on their facts, are even more significantly opinions rendered at summary judgment after a full factual record could be developed. For example, in *Drisin,* the court specifically noted that a motion to dismiss had been denied. *Drisin v. Fla. Int'l Board of Trs.,* No. 16-24939-CIV-WILLIAMS, 2019 WL 289581, at *7 (S.D. Fla. Jan. 17, 2019). *Wen Liu* was also decided on summary judgment on "[u]ncontested record evidence" that the employee "received a letter ... that gave written, unequivocal notice that Liu's employment was terminated effective 12 months from that date," and the employee herself "reported on her EEOC charge form that ... the date she was given notice of her termination, was the last date discrimination took place." 693 F. App'x at 797. Here, there is no uncontested record, the University's own letter is extrinsic to the pleadings, the operative communication was oral and undated, Dr. Stang identifies the date he was replaced with a materially younger employee in July or August as an additional adverse action date, and the purported letter notice contains a date of termination different from the actual termination date.

**E. ALTERNATIVELY, EQUITABLE TOLLING PRESENTS A FACT QUESTION THAT CANNOT BE RESOLVED ON THE PLEADINGS.**

Even if the Court concluded that the clock began in March 2024 as to the September termination of assignment, the ADEA charging period "is subject to equitable modification," which "suspends a limitations period 'until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights.'" *Cocke v. Merrill Lynch & Co.*, 817 F.2d 1559, 1561 (11th Cir. 1987) (citation omitted). "Summary judgment is often inappropriate when tolling is at issue in an ADEA action." *Id.* And "equitable tolling does not require employer misconduct. Rather, equitable tolling focuses on the employee with a reasonably prudent regard for his rights." *Id.*

In *Cocke*, the Eleventh Circuit held that "[i]t is too much for the law to expect an employee to sue his employer for age discrimination at the same time he is led to believe the employer is

trying to place him in another job," and that the situation "presents a triable fact which cannot be disposed of on summary judgment." *Id.* at 1561-1562. Courts in this District have applied the same principle, explaining that the "relevant question" is whether the employee "reasonably believed at the time that she would be favorably accommodated so as to obviate any discrimination ... charge." *Calicchio v. Oasis Outsourcing Grp. Holdings, L.P.*, 584 F. Supp. 3d 1215, 1243–1244 (S.D. Fla. 2021) (cleaned up, citation omitted).

Indeed, the Eleventh Circuit dealt with similar facts in *Sturniolo*, where an employee was provided with a purportedly legitimate business reason for the adverse action, finding tolling appropriate in that situation. *Sturniolo v. Sheaffer, Eaton, Inc.*, 15 F.3d 1023, 1025-26 (11th Cir. 1994). The employee in *Sturniolo*, relying on the purported reason given, believed he did not have a basis to support a charge until he was *actually* replaced with a younger employee. *Id.* In those circumstances, where the district court granted summary judgment for the employer on timeliness grounds, the Eleventh Circuit vacated and remanded, finding that the employee's limitations period should have been tolled until the employee was actually replaced by a younger worker. *Id.*

The same logic applies where, as alleged here, the employer responds to the employee's complaint that the decision is age-discriminatory by undertaking to "look into the allegations and speak with those involved," and subsequently states that the result of the investigation revealed a legitimate, non-age-based reason for the decision. Compl. ¶¶ 30-36. Where an employee who is told the University will investigate and is then misled by the employer's statement that a legitimate non-discriminatory reason exists, the period for filing should likewise be tolled until he has the actual evidence of his discriminatory replacement with a younger employee. *See Sturniolo,* 15 F.3d at 1025-26. In *Jones v. Dillard's*, as well, the Eleventh Circuit held that equitable tolling "operates to save [the plaintiff's] claims" where, before the employer hired a younger replacement, she "had only a mere suspicion of age discrimination." *Jones v. Dillard's, Inc.,* 331 F.3d 1259, 1267–1268 (11th Cir. 2003). Here, while the comments made to Dr. Stang certainly suggested that the University may have a discriminatory motive for replacing him, particularly given the "investigation" and resulting purportedly "legitimate" reason he was provided at its conclusion, he was not certain of the discrimination to a level sufficient to file a charge until University replaced him with a materially younger physician, which the Complaint alleges occurred in July or August 2024. Compl. ¶ 47. Even if the period were tolled only until that replacement, the March 28, 2025, Charge would have been filed within 300 days of July 1, 2024.

A plaintiff may plead himself out of court "alleging facts that foreclose a finding of diligence or extraordinary circumstances." *See Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 971 (11th Cir. 2016) (*en banc*). The Complaint alleges no such facts. Whether tolling applies is therefore a question for a developed record, not a motion to dismiss.

**F. THE RETALIATION CLAIMS ARE TIMELY AND PROPERLY EXHAUSTED.**

***1. The Retaliation Claim Accrued When the Recredentialing Denial Was Communicated in June 2025.***

The University contends that Dr. Stang "knew" of the retaliatory conduct by his internal email of October 21, 2024 and was required to amend his charge within a year of that date. Mot. at 9. This is incorrect as a matter of fact and law, and dismissal on this basis would be improper.

Each "retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice[,]'" and a discrete act "'occurred' on the day that it 'happened.'" *Morgan,* 536 U.S. at 110, 114. In *Riccard*, the Eleventh Circuit held that a retaliatory failure to reinstate is "a discrete retaliatory act akin to a refusal to hire or promote," so that each occurrence carries its own clock and timely occurrences "would not be barred as a matter of law on statute of limitations grounds." 307 F.3d at 1291–1292.

The October 2024 email shows only that Dr. Stang complained that Dr. Chatzizisis was interfering with his recredentialing paperwork. The message he had received stated that recredentialing "will no longer be necessary *at this time*." Mot. at 4 (emphasis added). That language is itself tentative. And after Dr. Stang complained, the University's process continued: the form was redirected to the VA Chief, who completed it satisfactorily. Compl. ¶ 62. Based on his decades of experience, Dr. Stang reasonably expected approval by May 2025. *Id.* ¶ 63. No decision regarding recredentialing was apparent as of that point, or any point prior to June 25, 2025, when the actual denial of recredentialing and bar from clinical work was communicated. *Id.* ¶¶ 64-65, 68. That is the discrete retaliatory act, and it is the act for which Dr. Stang seeks relief.

The FCRA requires a charge within 365 days of the alleged violation. *Wen Liu,* 693 F. App'x at 796. Measured from June 25, 2025, the Amended Charge, filed June 10, 2026, was filed 350 days later, within that period. Moreover, the Complaint alleges that Dr. Stang first amended the Charge by request to the EEOC on December 4, 2025, only 162 days after the June 25, 2025,

denial, and well within both the 300-day and 365-day periods. Compl. ¶ 17. The FCRA retaliation claim is timely on its own terms.

The Eleventh Circuit has also recognized that an employee is not on notice of a retaliation claim merely because he knows of an adverse act; he must have reason to know the act was retaliatory. In *Hargett*, the court held a retaliation charge timely because the employee "was not reasonably put on notice that his EEOC filing caused the adverse employment action" until later, and the earlier refusal to rehire "was entirely consistent with the age discrimination claim." *Hargett v. Valley Fed. Sav. Bank*, 60 F.3d 754, 765 (11th Cir. 1995). To the extent the Complaint alleges that the June 2025 denial was retaliation for the March 28, 2025, Charge itself, that theory could not have accrued in October 2024, before the Charge existed.

***2. The Amended Charge Relates Back to the Original Charge.***

The retaliation allegations also relate back to March 28, 2025, the date of the original charge. Under the EEOC's regulation, a charge "may be amended ... to clarify or amplify allegations made therein," and "[s]uch amendments and amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received." 29 C.F.R. § 1626.8(c). The Eleventh Circuit applies this rule to both Title VII and ADEA charges. *See Kelly v. Dun & Bradstreet Corp.,* 457 F. App'x 804, 805 (11th Cir. 2011); *see also Wilcox v. Corr. Corp. of Am.,* 603 F. App'x 862, 866 (11th Cir. 2015).

The original Charge described Dr. Chatzizisis's conduct, identified a course of discrimination beginning in March 2024, and checked the "continuing action" box. The Amended Charge detailed the recredentialing interference by the same decisionmaker that grew directly out of the same removal.[3] To raise retaliation claims that grow out of a charge, it is enough for a plaintiff to file a charge, the investigation of which "would have reasonably uncovered any evidence of retaliation." *Gregory v. Georgia Dep't of Hum. Res.,* 355 F.3d 1277, 1280 (11th Cir. 2004). Dr. Stang's initial Charge satisfied that standard, and his Amended Charge explicitly raised

[3] To the extent the University takes issue with the Charge's formal amendment coming close to the Right to Sue notice, its purported concerns lack merit. The issues raised in the formally amended Charge were previously timely raised before the EEOC on December 4, 2025, and the original charge was pending since March 2025. The EEOC therefore investigated the retaliation alleged and the purpose of exhaustion has been served.

the retaliatory conduct. Because amendments growing out of the original charge relate back to the date it was first received, the retaliation allegations are timely under the ADEA's 300-day period as well.

### *3. Retaliation Growing Out of a Pending Charge Need Not Be Separately Exhausted.*

Independently, the retaliation claim required no separate or amended charge. The Eleventh Circuit has held that "it is unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge; the district court has ancillary jurisdiction to hear such a claim when it grows out of an administrative charge that is properly before the court." *Thomas v. Miami Dade Pub. Health Tr.,* 369 F. App'x 19, 23 (11th Cir. 2010) (citation omitted).

The Complaint alleges that, to the extent the University made, implemented, or reaffirmed the decision not to process the recredentialing application after learning of the March 28, 2025, Charge, that conduct was retaliation for the Charge itself. Compl. ¶¶ 69, 87. The June 25, 2025, denial post-dated and grew out of the pending Charge. As such, no additional amended charge was needed at all, and the retaliation claim is properly before this Court. *Thomas,* 369 F. App'x at 23.

### *4. Any Residual Gap Is Subject to Equitable Tolling.*

Finally, the charge-filing requirement is a non-jurisdictional claim-processing rule. *Davis*, 587 U.S. at 550-552; *Sturniolo,* 15 F.3d at 1025 ("the requirement that a claimant file 'a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to sue in federal court[.]") (citation omitted).

To the extent the University contends that Dr. Stang should have charged retaliation before the recredentialing denial was consummated and its retaliatory basis became apparent, equitable modification would suspend the period "until the facts which would support a charge of discrimination are apparent or should be apparent to a person with a reasonably prudent regard for his rights." *Sturniolo*, 15 F.3d at 1025–1026. The Court need not reach tolling, however, because the retaliation claim is timely for the independent reasons above.

### G. DISMISSAL WITH PREJUDICE AND AWARD OF FEES IS IMPROPER.

The University asks the Court to dismiss with prejudice on the theory that amendment would be futile. Mot. at 9. Rule 15(a)(2) provides that "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Futility is not present here because the claims are timely as pleaded, for all the reasons above. In *Mooshie*, the court held that dismissal "with prejudice" was reversible error where the facts on the face of the complaint "did not conclusively establish the expiration of the statute of limitations." *Mooshie*, 397 So. 3d at 1205. The University's authorities, *Alford*, *Edmunds*, and *McCray*, involved charges that were untimely on their face. Mot. at 9-10. That is not this case.

At a minimum, the timeliness questions turn on what was communicated in March 2024, by whom, and with what finality, the effect of the May letter Defendant raises, the effect of the investigation and resulting communications to Dr. Stang that any decision was made for a non-discriminatory reason, the effect of the hiring of the replacement and whether that was a discrete discriminatory act, and on when the recredentialing decision was made. Those questions can only be answered on a developed record. Should the Court find any pleading deficiency, dismissal should be without prejudice, and Dr. Stang respectfully requests leave to amend.

Further, the University's request for fees is premature and completely unsupported. The request should be denied.

## V. CONCLUSION

For the foregoing reasons, Plaintiff Dr. Robert Brian Stang respectfully requests that the Court deny the University's Motion to Dismiss in its entirety. In the alternative, Plaintiff requests that any dismissal be without prejudice and with leave to amend.

Dated: November 25, 2026

Respectfully submitted,

/s/ Angeli Murthy

Angeli Murthy, Esq., B.C.S.
Florida Bar No. 088758
MORGAN & MORGAN, P.A.
8151 Peters Road, Suite 4000
Plantation, FL 33324
Telephone: (954) 327-5369
Facsimile: (954) 327-3016
Email: amurthy@forthepeople.com
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 24, 2026, a true and correct copy of the foregoing was served upon the Court and all counsel of record via email, and that on November 25, 2026, a true and correct copy of the foregoing was filed and served via the Court's CM/ECF system.

/s/ Angeli Murthy
Angeli Murthy, Esq.